## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MANOUCHER MOHAMMADI, *et al.*,

Plaintiffs,

v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

Defendants.

Civil Action No. 09-1289 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

This is an action brought by and on behalf of four former Iranian nationals who were imprisoned, tortured, and/or killed in a Tehran prison.  The action is brought against the Islamic Republic of Iran, Ayatollah Sayid Ali Hoseyni Khamenei, President Mahmoud Ahmadinejad, and the Army of the Guardians of the Islamic Revolution (the "Revolutionary Guard"), under the Alien Tort Statute, 28 U.S.C. § 1350, the Torture Victim Protection Act, 28 U.S.C. § 1350 note, and the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et seq.*  The defendants have never appeared in or defended against this action, and the plaintiffs now seek default judgment for the damages caused by the imprisonment, torture, and extrajudicial killing perpetrated by the defendants.  For the reasons discussed below, the Court finds that it lacks jurisdiction to grant default judgment against any of the defendants.

## I.    BACKGROUND

As will be discussed further below, the Court held an evidentiary hearing in this matter on April 4, 2013, at which the plaintiffs presented witnesses, videotape, and other documentary evidence to support their claims.  The factual background laid out below summarizes the relevant evidence that the plaintiffs have submitted, both at the evidentiary hearing and through the filing of affidavits and other documentary evidence.

1

A.      **Factual Background**

The plaintiffs are three siblings of Akbar Mohammadi, who was tortured and killed while in Iranian custody.  *See* Third Am. Compl. ("TAC") ¶ 2, ECF No. 42.  Plaintiffs Nasrin Mohammadi and Simin Taylor are Akbar's sisters,[1] and plaintiff Manouchehr Mohammadi is Akbar's brother.  *Id.*  Although Akbar is also referred to as a plaintiff in the Third Amended Complaint, *see id.*, the plaintiffs clarify that Nasrin represents the estate of Akbar in this action.  *See* Supplemental Legal Mem. on Jurisdiction & Related Issues ("Pls.' Mem.") at 4, ECF No. 40.[2]  All three plaintiffs were born in Iran, though all of them currently reside in California.  TAC ¶ 2.

In 1994, Manouchehr and Akbar were college students living in Tehran, where they became involved in political activism.  *See* Aff. of Manouchehr Mohammadi ("Manouchehr Aff.") ¶¶ 3–4, ECF No. 20-1; Hr'g Ex. 3 ("Akbar Diary") at 2–3, ECF No. 20-1.[3]  During this time, Akbar and Mancouchehr organized pro-freedom and pro-democracy political gatherings that were critical of the Iranian government.  *See* Manouchehr Aff. ¶¶ 5–6, 16; *see also* Tr. of Evidentiary Hr'g at 30:16–22, 31:15–23 (Apr. 4, 2013), ECF No. 33-1.  These political activities drew the attention of the Iranian government, who "considered [them] enemies."  Manouchehr Aff. ¶ 6.  As a part of their political activism, Akbar and Manouchehr participated in the student protests in Tehran in July 1999.  *See id.* ¶ 16; *see also* Howard Schneider & John Lancaster,

---

[1] Ms. Taylor legally changed her name from Khadijeh Mohammadi to Simin Taylor when she became a United States citizen in December 2011.  *See* Aff. of Simin Taylor ("Taylor Aff.") ¶¶ 3, 10.

[2] A deceased individual cannot serve as the real party in interest in a civil action. *See* FED. R. CIV. P. 25(a)(1) ("If a party dies and the claim is not extinguished, the court may order substitution of the proper party.").  Although Rule 25 is normally applied when a party dies during the pendency of an action, the Court finds substitution to be appropriate in this case.  Therefore, to the extent that Akbar Mohammadi is a named plaintiff, the Court *sua sponte* substitutes Nasrin Mohammadi, the representative of the estate of Akbar Mohammadi, in the place of Akbar Mohammadi as the proper party in this action.

[3] Exhibit 3 is a diary that was kept by Akbar, which he wrote in 2005 while furloughed from prison on sick leave. *See* Tr. of Evidentiary Hr'g at 113:2–4, ECF No. 33-1.  That diary was later published in 2012 as book entitled Ideas and Lashes: The Prison Diary of Akbar Mohammadi.  A copy of this book was admitted into evidence at the evidentiary hearing.  *See* Exhibit List at 1, ECF No. 31.

*Violence Rages for 6th Day in Tehran; Police, Vigilantes Disperse Student Demonstrators in Battle over Reform* (hereinafter Schneider & Lancaster, *Violence Rages*), WASH. POST, July 14, 1999, at A1.  Those protests, which were "among the largest" since the 1979 revolution, "began in reaction to a violent police raid on a Tehran University dormitory" and "spread quickly to several other cities and broadened into an outcry of frustration with [the Iranian] social and political order."  *See* Schneider & Lancaster, *Violence Rages*.  The dormitory raid had been "a response to a much smaller student protest of the closing of a liberal newspaper," but the clashes between students and security forces ultimately left at least two people dead and an unknown number of students in police custody.  *Id.*; *see also* Howard Schneider & John Lancaster, *100,000 Rally Behind Iran's Clerics; Demonstration Counters Week of Protests by Reform-Minded Students*, WASH. POST, July 15, 1999, at A19.

On July 15, 1999, Akbar and Manouchehr were arrested by agents of the Iranian Ministry of Information for their role in the protests and were brought to Evin prison, which is located in Tehran.  *See* Manouchehr Aff. ¶ 17; Akbar Diary at 3–5; Aff. of Michael Ledeen ("Ledeen Aff.") ¶ 16, ECF No. 34-1.  While incarcerated at Evin, Akbar and Manouchehr were brutally and repeatedly tortured.  *See* Manouchehr Aff. ¶ 24.  The physical torture consisted of, *inter alia*, flogging the brothers with cables, hanging them from the ceiling by their hands for hours on end, depriving them of sleep, exposing them to the elements in their prison cells, burning their genitals with a cigarette lighter, and beating them to the point of unconsciousness.  *See, e.g.*, Akbar Diary at 9–10; Tr. of Evidentiary Hr'g at 51:2–54:19.[4]  Their torture was also psychological in nature.  As Manouchehr testified at the evidentiary hearing, he and Akbar were tortured in front of one another and forced to undergo at least five mock executions and other

---

[4] Akbar's diary provides a much more detailed, day-by-day account of the torture that he suffered and the interrogations he underwent. *See* Akbar Diary at 9–35.

threats of execution, which were intended "to break [them] psychologically down." *See* Tr. of Evidentiary Hr'g at 48:18–22, 49:1–13.   In moving testimony at the evidentiary hearing, Manouchehr described how this torture has resulted in his permanent physical and psychological damage, including the removal of nine teeth, persistent pain throughout several areas of his body, and a general inability to enjoy life. *See id.* at 49:25–51:10, 53:22–54:6; Manouchehr Aff. ¶ 49.

The torture described above lasted for over seven years. *See* Manouchehr Aff. ¶¶ 54–55. In July 2006, Akbar went on a hunger strike—one of several hunger strikes during his imprisonment. *See* Tr. of Evidentiary Hr'g at 55:15–56:10; *see also* TAC ¶ 21; Akbar Diary at 27–30 (describing other hunger strikes).   After five days of refusing food in his cell, Akbar was moved to the prison's clinic, where he received medical treatment and continued to refuse food for three more days. *See* Tr. of Evidentiary Hr'g at 55:15–56:10.   During this hunger strike, Akbar was beaten as well. *See id.*   At the evidentiary hearing, Manouchehr recounted that, after this eight-day hunger strike, on July 31, 2006, Akbar died. *See id.* at 57:8–58:5; TAC ¶ 21. Manouchehr further testified that Akbar was suspected to have been killed by an unspecified type of "dust" sprayed in Akbar's hospital room, which "would cause you a heart attack." *See* Tr. of Evidentiary Hr'g at 58:9–59:2.   The precise cause of Akbar's death was never determined, however. *See* Manouchehr Aff. ¶ 59.   The plaintiffs presented evidence that the arrest, torture, and murder of Akbar were done pursuant to the direct orders of defendants Khamenei and Ahmadinejad. *See* Aff. of Alan Keyes ¶ 7, ECF No. 34-2 ("[A]ll actions undertaken . . . by the Iranian regime, with regard to the arrest, torture, and murder of Iranian dissidents are done under the direct order of the Supreme Leader Ayatollah Ali Khamenei, and Iranian President Mahmoud Ahmadinejad."); Tr. of Evidentiary Hr'g at 143:25–144:3 ("[W]hen it comes to important things

4

like killing dissidents, like building nuclear weapons, like sending terrorist teams overseas, they do not freelance. This is done at a very, very high level.").[5]

After Akbar's death, Manouchehr was permitted to leave prison temporarily to attend Akbar's funeral. *See* Manouchehr Aff. ¶¶ 55, 64. While on leave from prison, Manouchehr fled to Iraq, and then crossed the border into Turkey. *Id.* ¶ 65. While in Turkey, Manouchehr was arrested and threatened with extradition to Iran, but in October 2006 the U.S. State Department intervened and secured Manouchehr's safe passage to the United States. *See id.* ¶¶ 65–66; Supplemental Aff. of Manouchehr Mohammadi ("Manouchehr Supp. Aff.") ¶ 2, ECF No. 35-2; Tr. of Evidentiary Hr'g at 42:17–44:2. In addition to the State Department, Manouchehr was aided by journalist Michael Ledeen and former U.S. government official Richard Perle. *See* Manouchehr Supp. Aff. ¶ 3; Ledeen Aff. ¶ 13. On August 3, 2010, Manouchehr became a permanent resident of the United States. Manouchehr Supp. Aff. ¶ 5.

The evidence submitted by the plaintiffs also reveals that Akbar and Manouchehr were not the only members of the Mohammadi family to be injured by one or more of the defendants or their agents. Nasrin testified at the evidentiary hearing that an individual she believed to be an agent of the Iranian government attempted to murder her in July 2002 while she was living in Germany. *See* Tr. of Evidentiary Hr'g at 89:14–20, 91:16–92:24; Pls.' Ex. 2, at 2–3 (admitted at evidentiary hearing). Nasrin also testified that she attempted suicide after Akbar's death. *See* Tr. of Evidentiary Hr'g at 109:17–110:20. Additionally, Simin Taylor averred that she was imprisoned in Iran at some unspecified time prior to October 2006, and while in prison she was threatened with rape. *See* Taylor Aff. ¶¶ 4, 7. She states that she "continue[s] to suffer from nightmares because of the memories [she has] from prison." *Id.* ¶ 11.

---

[5] It is worth noting, however, that Ahmadinejad did not assume the office of the presidency in Iran until August 2005. *See, e.g.*, Nazila Fathi, *Iran Tells Europe It's Devoted to Nuclear Efforts and Talks*, N.Y. TIMES, Aug. 4, 2005, at A10 (reporting that Ahmadinejad's presidential inauguration was "set for Saturday[, August 6, 2005]").

Furthermore, Manouchehr and Nasrin testified that they have experienced ongoing harassment from the Iranian regime since relocating to the United States.  For example, Manouchehr testified that he has received several threatening telephone calls from individuals in Iran who identify themselves as being a part of the Iranian Ministry of Intelligence.  *See* Tr. of Evidentiary Hr'g at 79:4–83:17.  These phone calls have included threats to Manouchehr's life and the lives of his parents, who still live in Iran.  *See id.*  Nasrin testified that in 2009 her Facebook account was hacked, and a doctored photograph of her, depicting her in an immodest light, was circulated to her friends and professional acquaintances.  *See id.* at 164:23–166:14. Nasrin also testified that she believes there to be "agents" of the Iranian government living in the United States who are monitoring the plaintiffs' activities and who "want to hurt . . . people or kill people."  *See id.* at 166:15–167:7.[6]  This was corroborated by the plaintiffs' expert witnesses. Former CIA Director R. James Woolsey, Jr. testified that agents of the Iranian regime carry out operations to harm Iranians overseas, including in the United States.[7]  *See id.* at 120:6–25. Additionally, Kenneth R. Timmerman, an author and former Middle East reporter, testified that Iranians living in the Los Angeles area in particular are "under high surveillance by Iranian government agents."  *Id.* at 127:8–16[8]

Currently, Nasrin is a United States citizen—a status she obtained on April 22, 2009.  *See* Supp. Aff. of Nasrin Mohammadi ("Nasrin Supp. Aff.") ¶ 6, ECF No. 35-1.  Nasrin first applied

---

[6] Plaintiffs' counsel also claims that he has received death threats and suffered a computer hack due to his representation of the plaintiffs in this action.  *See* Aff. of Larry Klayman ¶¶ 2–3, ECF No. 36-1.

[7] The Court permitted Mr. Woolsey to provide expert testimony on the subject of "human rights violations done by Iran or organs and instruments of Iran, both domestically and abroad."  *See* Tr. of Evidentiary Hr'g at 117:6–16. The Court allowed this testimony because the plaintiffs established that Mr. Woolsey has extensive experience in areas of national security, foreign intelligence, and international relations, including most notably his service as Director of Central Intelligence in the early 1990s.  *See id.* at 115:3–117:5.

[8] The Court permitted Mr. Timmerman to provide both fact and expert testimony about the human rights violations committed against the plaintiffs and how those violations were committed at the direction of defendants Khamenei and Ahmadinejad.  His expert testimony was based on his extensive professional expertise as an investigative reporter in the Middle East.  *See* Tr. of Evidentiary Hr'g at 122:14–126:24.

for permanent residency in the United States in June 2005, and she received that permanent residency in February 2006.  *Id.* ¶¶ 4–5.  Manouchehr applied for permanent residency in October 2006 and was granted permanent resident status on August 3, 2010.  *See* Manouchehr Supp. Aff. ¶¶ 2–3, 5.  Ms. Taylor applied for permanent residency on October 1, 2007 and became a United States citizen on December 15, 2011.  *See* Taylor Aff. ¶¶ 8, 10.

### B.    Procedural Background

The plaintiffs filed their original Complaint in this action on July 10, 2009.  *See* ECF No. 1.[9]  They filed an Amended Complaint on January 27, 2010.  *See* Am. Compl., ECF No. 5.  The previous presiding Judge in this case directed the plaintiffs to file proof of service of the Amended Complaint upon the defendants.[10]  *See* Order dated Aug. 20, 2010, ECF No. 6.  Before the Amended Complaint was served, the plaintiffs filed a Second Amended Complaint on September 22, 2010, with the leave of the Court.  *See* Second Am. Compl. ("SAC"), ECF No. 11. Each of the three aforementioned iterations of the plaintiffs' complaint were pleaded as class actions.  The original Complaint and the Amended Complaint were brought on behalf of a class consisting of "all Iranians who have had their civil and human rights violated, been assaulted, battered, tortured, and even murdered to keep a vicious, illegitimate and inhuman radical regime in power."  Compl. ¶ 7; Am. Compl. ¶ 13.  The Second Amended Complaint was brought on behalf of a class consisting not only of "Iranians and Iranian-Americans" harmed by the Iranian regime but also "United States servicemen stationed in Iraq, Afghanistan, Pakistan, and

---

[9] The plaintiffs filed a "Report to the Court Concerning Service of Process" on January 26, 2010, in which they described "serv[ice of] the initial complaint on Defendant Ahmadinejad at a state dinner that he was attending at the Barclay Intercontinental Hotel while he was meeting with the U.N. General Assembly in New York City on September 23, 2009."  *See* ECF No. 4, at 2.  The plaintiffs did not provide any proof that this service took place, such as an affidavit from the individual who performed such service, as required by the Federal Rules.  *See* FED. R. CIV. P. 4(*l*)(1).  At that time, the plaintiffs also stated that the Amended Complaint would "need to be reserved [sic] through diplomatic channels using the Swiss government," and "Plaintiffs intend to have [t]he translated Amended Complaint delivered to Swiss diplomatic channels in the next ten days."  Pl.'s Report Concerning Service of Process at 2–3.

[10] The current presiding Judge was assigned to this case on January 19, 2011.

elsewhere . . . who were murdered or harmed or threatened by or as a direct and proximate result of Defendants' actions."  SAC ¶¶ 9, 10.

On December 15, 2010, in response to the Court's directive, the plaintiffs filed an affidavit from a third party, stating that he had "personally served each and every one of the named defendants by serving the Embassy of Switzerland [in Washington, D.C.], which is the representative of the Islamic Republic of Iran and its government officials and entities with regard to the United States."  *See* Return of Service at 2, ECF No. 14.  Service was performed by hand-delivering summonses and copies of the Amended Complaint to "the document intake person inside the [Washington, D.C.] Embassy."[11]  *Id.*  Over nine months later, the plaintiffs

---

[11] The affidavit filed by the plaintiffs regarding service of process on the defendants appears not to comply with either the Foreign Sovereign Immunities Act ("FSIA") or the Federal Rules of Civil Procedure.  "There are four methods for serving a foreign state upon a foreign state, and they are listed in § 1608(a) in order of descending preference." *Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 59 (D.D.C. 2007).  The least-favored method of serving a foreign state is service "through diplomatic channels," which requires the clerk of the court to "send[] [translated versions of] two copies of the summons and complaint and a notice of suit . . . to the Secretary of State in Washington, District of Columbia."  28 U.S.C. § 1608(a)(4).  The State Department must then "transmit one copy of the papers through diplomatic channels" and "shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*  The plaintiffs did not comply with this provision. *See, e.g.*, *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994) ("[S]trict adherence to the terms of 1608(a) is required.").  First, the service papers were not "dispatched by the clerk of the court to the Secretary of State." *See* 28 U.S.C. § 1608(a)(4).  In fact, neither the clerk of this Court nor the State Department appear to have had any involvement whatsoever in the plaintiffs' attempt to serve the defendants. *See* Return of Service, at 2.  Second, the plaintiffs have submitted no proof that the service papers were "transmit[ted] . . . through diplomatic channels *to the foreign state*." *See* 28 U.S.C. § 1608(a)(4) (emphasis added).  It is true that the U.S. Interests Section of the Swiss Embassy *in Tehran* is the proper diplomatic channel through which to serve Iran, *see, e.g.*, *Nikbin*, 471 F. Supp. 2d at 60, but the plaintiffs here merely left the service papers with "the document intake person inside the [Swiss] Embassy" in Washington, D.C, *see* Return of Service, at 2.  Finally, the "certified copy of the diplomatic note indicating when the papers were transmitted" was never filed with the clerk of this Court, as required by the FSIA. *See* 28 U.S.C. § 1608(a)(4).

Likewise, the plaintiffs' proof of service does not appear to comply with Federal Rule of Civil Procedure 4(f), which describes the methods by which a summons can be served upon individuals in a foreign country. *See* FED. R. CIV. P. 4(f).  Such methods must be used when serving individual officials of a foreign sovereign who are located in a foreign country because those officials do not qualify as a "foreign state" under the FSIA. *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2292 n.20 (2010).  The plaintiffs' method of service—leaving papers at the Swiss Embassy in Washington, D.C.—does not satisfy any of the methods outlined in Rule 4(f).  It is perhaps possible that the plaintiffs served the defendants "as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction." *See* FED. R. CIV. P. 4(f)(2)(A).  The Court is not familiar with Iranian law and cannot comment on whether the plaintiffs complied with Iran's requirements for service of process, but the Court finds it highly improbable that the method of service described in the plaintiffs' return of service affidavit satisfies any country's requirements for serving process.

filed a motion for entry of default and for default judgment against the defendants.  *See* Mot. for

Entry of Default & Mot. for Default J. ("Default Mem."), ECF No. 15.  The Court granted the

plaintiffs' request regarding the entry of default and directed the Clerk to enter a default against

each of the defendants, *see* Order dated Dec. 8, 2011, ECF No. 16, and the Clerk did so on

December 8, 2011, *see* Default, ECF No. 17.  The Court held a status conference on December

16, 2011, at which the Court directed the plaintiffs to submit evidence by way of affidavits to

establish the defendants' liability.  *See* Minute Order dated Dec. 16, 2011.  The Court also

scheduled an evidentiary hearing to establish damages.  *See id.*

The plaintiffs submitted two affidavits in support of liability on February 9, 2012: one

from Manouchehr Mohammadi, and one from Kenneth Timmerman.  *See* Aff. of Manouchehr

Mohammadi (Feb. 3, 2012), ECF No. 20-1; Aff. of Kenneth R. Timmerman (Feb. 8, 2012), ECF

No. 20-2.  On December 14, 2012, the Court held a further status conference with plaintiffs'

counsel to discuss the procedures for submitting further evidence and to clarify the scope and

nature of the plaintiffs' claims.  During that status conference, plaintiffs' counsel indicated to the

Court that the plaintiffs intended to abandon their class-action allegations and to proceed only

with the Mohammadis as plaintiffs.  *See* Tr. of Status Conference at 4:12–5:8 (Dec. 14, 2012).

The Court also set a date for an evidentiary hearing during that December 12, 2012 status

conference, for the purpose of receiving any further evidence regarding liability or damages.  *See*

Minute Entry dated Dec. 14, 2012.

In preparation for the evidentiary hearing, the Court directed the plaintiffs to file a final

witness list and any further affidavits or declarations.  *See* Order dated Mar. 22, 2013, ECF No.

---

The Court need not decide whether these defects in service have any effect on the Court's personal jurisdiction over the defendants because the Court dismisses this action on other jurisdictional grounds.  The Court observes these defects in service in any event to make clear that there is a serious question as to whether the Court has personal jurisdiction over any of the defendants, and therefore subject-matter jurisdiction is not the only jurisdictional hurdle faced by the plaintiffs in this case.

25.  The Court also directed the plaintiffs' counsel to come to the evidentiary hearing prepared to discuss further (1) the scope of the relief sought by the plaintiffs; and (2) the basis for the Court's subject-matter jurisdiction over this action.   The Court held an evidentiary hearing on April 4, 2013, in which the plaintiffs presented testimony and other evidence to support their claims. Prior to the presentation of evidence, the Court held oral argument with plaintiffs' counsel regarding the jurisdictional questions raised by the Court's April 1, 2013 Order.  *See* Tr. of Evidentiary Hr'g at 4:5–26:13.  After hearing the plaintiffs' arguments, the Court concluded: "I am not fully persuaded yet that I have either subject matter jurisdiction to hear these claims, nor personal jurisdiction over the two individual officials in order to enter any form of default judgment against any . . . of the defendants."  *Id.* at 26:17–21.  The Court further cautioned:  "I am going to hear testimony today, but I don't want you or your clients to be under any misimpression about my continuing feelings of being quite troubled by the jurisdictional—both subject matter and personal jurisdictional issues raised by the—by these claims."  *Id.* at 27:6–11; *see also id.* at 27:14–20 ("Since the plaintiffs have been waiting for some time now to tell their story, to have their claims heard, I'm not going to deny them that opportunity now, and we'll give you sufficient time to try and persuade me of your very creative interpretations of both the 'torture' definition and the scope and reach of the FSIA.").

Following the evidentiary hearing, the Court provided the plaintiffs yet another opportunity to submit further evidence in support of liability or damages, and the Court also permitted the plaintiffs to submit supplemental briefing regarding the subject-matter jurisdiction and personal jurisdiction issues discussed during oral argument.  *See* Minute Order dated Apr. 4, 2013.  On April 30, 2013, the plaintiffs filed a motion to amend their Complaint for a third time, *see* Pls.' Unopposed Mot. to File Third Am. Compl., ECF No. 39, which the Court granted, *see*

Minute Order dated May 15, 2013.  According to the Third Amended Complaint, filed on May 15, 2013, the plaintiffs alleges five claims for relief: (1) engaging in terrorism and/or providing material support to a terrorist organization; (2) assault and battery; (3) intentional infliction of emotional distress; (4) wrongful death; and (5) personal injury and death caused by acts of torture and extrajudicial killing, pursuant to 28 U.S.C. § 1605A.  *See* TAC ¶¶ 29–57.  The Third Amended Complaint is not pleaded as a class action, and the only named plaintiffs are Manouchehr Mohammadi, Nasrin Mohammadi, and Simin Mohammadi, on behalf of themselves and on behalf of Akbar Mohammadi.  *See id.* at 1.  Currently pending before the Court is the plaintiffs' motion for default judgment against all defendants.  For the reasons discussed below, the Court concludes that it lacks subject-matter jurisdiction over the plaintiffs' claims.

## II.   LEGAL STANDARD

### A.   Subject-Matter Jurisdiction

A federal court has "an affirmative obligation to consider whether the constitutional and statutory authority exist" for it to hear a case.  *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (internal quotation marks omitted).  The proponent of jurisdiction bears the burden of proving that jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  While "the district court may consider materials outside the pleadings," it must "still accept all of the factual allegations in the complaint as true."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations and internal quotation marks omitted).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  FED. R. CIV. P. 12(h)(3).

### B.   Default Judgment

Under Federal Rule of Civil Procedure 55(b)(2), the Court may consider default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  "[S]trong policies

favor resolution of disputes on their merits," and therefore "[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party."  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  A default judgment is appropriate when a defendant is "a 'totally unresponsive' party and its default plainly willful, reflected by its failure to respond to the summons and complaint, the entry of default, or the motion for default judgment."  *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 150 (D.D.C. 2011).  Where, as here, there is a complete "absence of any request to set aside the default or suggestion by the defendant that it has a meritorious defense, it is clear that the standard for default judgment has been satisfied."  *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008).

"[E]ntry of a default judgment is not automatic," however.  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted).  The procedural posture of a default does not relieve a federal court of its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action.  *See Ludwig*, 82 F.3d at 1092.  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.  The party seeking default judgment has the burden of establishing both subject-matter jurisdiction over the claims and personal jurisdiction over the defendants.  *See, e.g.*, *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008) ("The plaintiffs have the burden of establishing the court's personal jurisdiction over [the defendants]."); *Khadr*, 529 F.3d at 1115 ("[T]he party claiming subject matter jurisdiction . . . has the burden to demonstrate that it exists.").

Finally, when default is sought under the FSIA, a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also* H.R. Rep. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55(e), F.R. Civ. P."). "A flexible approach has been utilized in determining what procedures the court should employ in determining whether Rule 55(d)'s requirement of evidence satisfactory to the court is fulfilled." *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 139 (D.D.C. 2008). "[W]hen it seems advantageous, a court may conduct a hearing to determine whether to enter a judgment by default." 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2688 (3d ed. 2013); *see also* FED. R. CIV. P. 55(b)(2) ("The court may conduct hearings . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages . . . establish the truth of any allegations or evidence; or . . . investigate any other matter.").

## III. DISCUSSION

As the recitation of the factual background above makes clear, this case involves serious violations of human rights and international law. The entire Mohammadi family has been devastated by the heinous actions of the Iranian regime, and they continue to carry deep emotional and physical scars as a result of those actions. Nevertheless, "'[f]ederal courts are courts of limited jurisdiction,' possessing 'only that power authorized by the Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Although the plaintiffs ask this Court "to make the Mohammadi family whole" and "to send a strong message that these crimes against humanity will not be tolerated by the American system of justice," *see* Pls.' Mem. at 4, this Court may not exceed the limited powers conferred to it by Article III of the Constitution and by Congress. As

discussed below, the Court lacks subject-matter jurisdiction over the plaintiffs' claims in this matter, and therefore the Court does not have the authority to grant the plaintiffs the default judgment that they seek.  *See, e.g.*, *Vizer v. VIZERNEWS.COM*, 869 F. Supp. 2d 75, 84 (D.D.C. 2012) (denying default judgment where court lacked jurisdiction).

### A.   The Court Lacks Subject-Matter Jurisdiction Over Claims Against Iran and the Revolutionary Guard

The Foreign Sovereign Immunities Act ("FSIA") is "the sole basis for obtaining jurisdiction over a foreign state in our courts."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see also* 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of [the FSIA]."); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002) ("The [FSIA] . . . confers immunity on foreign states in all cases that do not fall into one of its specifically enumerated exceptions.").  The FSIA defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  In turn, the FSIA defines "agency or instrumentality of a foreign state" as "any entity" (1) "which is a separate legal person, corporate or otherwise, and" (2) "which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof" and (3) "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country."  *Id.* § 1603(b).  The Supreme Court has held, however, that the term "agency or instrumentality" in the FSIA does not refer to natural persons, such as individual government officials.  *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2286–87 (2010).  Therefore, in the instant case the Islamic Republic of Iran and the Revolutionary Guard

are considered a "foreign state" under the FSIA, but defendants Khamenei and Ahmadinejad are not. *See id.*[12]

The FSIA enumerates six general exceptions to foreign sovereign immunity, *see* 28 U.S.C. § 1605(a), as well as a seventh specific terrorism exception, *see id.* § 1605A. The plaintiffs rely on the terrorism exception in alleging subject-matter jurisdiction under the FSIA. *See* TAC ¶ 10 ("Defendants are subject to suit in the courts of the United States . . . because their conduct falls within the exceptions [sic] to foreign sovereign immunity set forth in 28 U.S.C. § 1605A.").[13] That portion of the FSIA contains a number of limitations on the scope of the terrorism exception, including, most notably, limitations on (1) the class of persons who may seek relief; and (2) the kinds of actions that allow plaintiffs to pierce the shield of foreign sovereign immunity. In particular, the terrorism exception states:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The statute further limits the scope of a court's jurisdiction to hear a claim under the terrorism exception by requiring that: (1) "the foreign state was designated as a

---

[12] It is unclear whether the Revolutionary Guard should be considered a "foreign state" or an "agency or instrumentality" thereof. *Compare Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 180 (D.D.C. 2010) (finding the Revolutionary Guard to be "an instrumentality of Iran that acts as a military arm of the government"), *with Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 116–17 (D.D.C. 2005) (finding core function of Revolutionary Guard to be governmental). This distinction, however, is immaterial in the instant case because the Court dismisses the claims against the Revolutionary Guard on immunity grounds. *See Nikbin*, 471 F. Supp. 2d at 64 ("[T]he immunity provisions of the FSIA do not distinguish between agencies and instrumentalities and the state itself.").

[13] In previous iterations of their Complaint, the plaintiffs also relied upon the exception at 28 U.S.C. § 1605(a)(5), commonly known as the "commercial tort exception" to foreign sovereign immunity. *See* Second Am. Compl. ¶ 13; Am. Compl. ¶ 9; Compl. ¶ 9. This basis for the assertion of jurisdiction is removed in the Third Amended Complaint, which is the operative one here.

state sponsor of terrorism at the time the [torture, extrajudicial killing, aircraft sabotage, or hostage taking] occurred" and "remains so designated;" (2) "the claimant or the victim was, at the time the [torture, extrajudicial killing, aircraft sabotage, or hostage taking] occurred . . . a national of the United States;" and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."   *Id.* § 1605A(a)(2)(A).   When these three statutory prerequisites for a waiver of foreign sovereign immunity are met, the FSIA terrorism exception provides a private right of action for victims of state-sponsored terrorism.   *See id.* § 1605A(c).

As discussed above, following the refinement of the claims in this case, and upon review of the plaintiffs' pre-hearing submissions, the Court required oral argument regarding whether the Court has subject-matter jurisdiction over the plaintiffs' claims.   The Court also permitted the plaintiffs to file further briefing and evidence regarding the basis for the Court's subject-matter jurisdiction under the FSIA.   *See* Minute Order dated Apr. 4, 2013; *see also* Tr. of Evidentiary Hr'g at 26:14–27:20.   In their supplemental briefing, the plaintiffs contend that they satisfy the statutory requirements of 28 U.S.C. § 1605A(a)(2).   *See* Pls.' Mem. at 17–21.   First, the plaintiff argues that "Iran is a state sponsor of terrorism."   *Id.* at 17.   This is unquestionably correct.   The Islamic Republic of Iran is designated a "state sponsor of terrorism" and has been since 1984. *See* U.S. Dep't of State, *Country Reports on Terrorism 2011* at 171–73 (2012), *available at* http://www.state.gov/documents/organization/195768.pdf; *Goldberg-Botvin v. Islamic Republic of Iran*, No. 12-1292, 2013 WL 1343663, at *4 (D.D.C. Apr. 4, 2013) ("Iran has been designated as a state sponsor of terrorism continuously since January 1984 through the present.").

Where the plaintiffs' jurisdictional argument falters, however, is with respect to the second requirement listed above, that "the claimant or the victim was, at the time the [torture, extrajudicial killing, aircraft sabotage, or hostage taking] occurred . . . a national of the United States." 28 U.S.C. § 1605A(a)(2)(A)(ii).  The plaintiffs argue that they satisfy this requirement by putting forth expansive interpretations of the terms "torture" and "national of the United States."  Both interpretations, however, are contrary to the plain language of the statutory text and the judicial decisions interpreting that language.

### 1.     *The Plaintiffs Were Not "Nationals of the United States" at the Time of the Acts Underlying Their Claims.*

As to the term "national of the United States," the plaintiffs contend that Manouchehr, Nasrin, and Akbar "owed their permanent allegiance to the United States and no longer had any loyalty to Iran after the first signs of persecution, including their initial imprisonment.  *See* Pls.' Mem. at 19; *see also* Tr. of Evidentiary Hr'g at 36:6–37:3, 40:5–24, 104:16–105:11.  The plaintiffs contend that this qualifies them as "nationals of the United States" because the FSIA incorporates the definition of "national" contained in the Immigration and Nationality Act.  *See* Pls.' Mem. at 18 (citing 28 U.S.C. § 1605A(g)(5)).  That statute defines "national of the United States" as either (1) "a citizen of the United States," or (2) "a person who, though not a citizen of the United States, *owes permanent allegiance to the United States*."  8 U.S.C. § 1101(a)(22) (emphasis added).  The plaintiffs rely on the "owes permanent allegiance" language in the immigration statute to contend that their manifestations of allegiance to the United States, and their concomitant severances of allegiance to Iran, were sufficient to qualify them as "nationals of the United States."  *See* Pls.' Mem. at 18–20; *see also* Tr. of Evidentiary Hr'g at 13:25–14:3 ("[W]e believe that the definition in the [FSIA] can be read more broadly than in the simple context of applying for residency or citizenship in the United States.").

In support of their argument, the plaintiffs contend that this Court "has expanded the definition [of 'national of the United States'] to include those who have taken the steps necessary to become permanent residents or citizens and thus have shown their intention of severing ties with their former countries." Pls.' Mem. at 19. To support this proposition, the plaintiffs cite two cases from within this Circuit. The first involved a claim under the FSIA by an individual who alleged that he had been tortured and imprisoned by Iran in July 2000. *See Asemani v. Islamic Republic of Iran*, 266 F. Supp. 2d 24, 24 (D.D.C. 2003). Before that date, the plaintiff in *Asemani* had become a permanent resident of the United States in 1994, and he had applied for United States citizenship in 1999. *Id.* at 26–27. He had also "pursued his application for citizenship through an interview with an Immigration and Naturalization officer in July 1999." *Id.* at 27. The court in *Asemani* held that these actions, in particular his application for U.S. citizenship, "demonstrated [the plaintiff's] permanent allegiance to the United States sufficient to constitute him a 'national' within the meaning of the FSIA." *Id.*; *see also id.* at 26 ("Recent cases, however, suggest that a person may become a 'national' of the United States by applying for citizenship." (collecting cases)).

The other case relied upon by the plaintiffs involved a non-citizen who was serving in the United States Army at the time that he was killed. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 40 n.4 (D.D.C. 2007). *Peterson* was brought under the previous version of the FSIA terrorism exception, before it was amended in 2008. The pre-2008 version of the terrorism exception required either the claimant or the victim to have been a national of the United States "when the act upon which the claim is based occurred." *See* 28 U.S.C. § 1605(a)(7)(B)(ii) (2006) (amended 2008). The court in *Peterson* observed that the decedent "remained a member of the United States Army in North Carolina from [1980] until his death in Beirut, Lebanon in

1983," and therefore it was "beyond any doubt that [his] allegiance to the United States was permanent." *Peterson*, 515 F. Supp. 2d at 40 n.4.

The facts of the instant case, however, are distinguishable from the facts at issue in both *Asemani* and *Peterson*. The plaintiffs in the instant case, unlike the plaintiff in *Asemani*, had not applied for or otherwise pursued United States citizenship at the time that the defendants perpetrated the acts of torture and extrajudicial killing that form the basis of the plaintiffs' FSIA claims. Although Nasrin Mohammadi applied for permanent residency in June 2005 and received permanent residency in February 2006 prior to Akbar's death, *see* Nasrin Supp. Aff. ¶¶ 4–5, permanent residency does not qualify a person as a "national of the United States." *See, e.g.*, *Abou-Haidar v. Gonzales*, 437 F.3d 206, 207 (1st Cir. 2006) ("[O]ne can become a 'national' of the United States only by birth or by naturalization under the process set by Congress."); *see also Lin v. United States*, 561 F.3d 502, 508 (D.C. Cir. 2009) (holding that "manifestations of 'permanent allegiance' do not, by themselves, render a person a U.S. national" (citing *Abou-Haidar*, 437 F.3d at 207)).[14]

Furthermore, more recent case law has rejected the legal foundation of *Asemani*'s holding regarding the definition of "national of the United States." The federal courts of appeals, including the D.C. Circuit, have unanimously endorsed the proposition that a person may only qualify as a "national of the United States" through birth or completion of the naturalization process.[15] *See Patel v. Napolitano*, 706 F.3d 370, 373–77 (4th Cir. 2013); *Lin*, 561 F.3d at 508

---

[14] Currently, Nasrin and Simin both qualify as "nationals of the United States." Nasrin has been a U.S. citizen since 2009, *see* Nasrin Supp. Aff. ¶ 6, and Simin has been a U.S. citizen since December 2011 and served in the U.S. Army from January 2011 to September 2011, *see* Taylor Aff. ¶¶ 9–10. Nevertheless, neither Nasrin nor Simin was a national of the United State at the time the operative acts of torture and extrajudicial killing took place between 1999 and 2006.

[15] A separate section of the Immigration and Nationality Act establishes four narrow categories of persons who qualify as nationals, but not citizens, of the United States. *See* 8 U.S.C. § 1408. The plaintiffs do not fit within any of those four categories.

(D.C. Circuit); *Omolo v. Gonzales*, 452 F.3d 404, 409 (5th Cir. 2006); *Abou-Haidar*, 437 F.3d at

207 (First Circuit); *Marquez-Alamanzar v. INS*, 418 F.3d 210, 218–19 (2d Cir. 2005); *Sebastian-*

*Soler v. U.S. Att'y Gen.*, 409 F.3d 1280, 1285 (11th Cir. 2005); *United States v. Jimenez-Alcala*,

353 F.3d 858, 861–62 (10th Cir. 2003); *Salim v. Ashcroft*, 350 F.3d 307, 310 (3d Cir. 2003);

*Perdoma-Padilla v. Ashcroft*, 333 F.3d 964, 966–67 (9th Cir. 2003); *see also Miller v. Albright*,

523 U.S. 420, 467 n.2 (1998) (Ginsburg, J., dissenting) (observing that, although "[n]ationality

and citizenship are not entirely synonymous . . . the only remaining noncitizen nationals are

residents of American Samoa and Swains Island").  *Asemani* relied upon three circuit court

decisions that have either been narrowed or effectively overruled by more recent decisions.  *See*

*Asemani*, 266 F. Supp. 2d at 26 (citing *Hughes v. Ashcroft*, 255 F.3d 752 (9th Cir. 2001), *United*

*States v. Morin*, 80 F.3d 124, 126 (4th Cir. 1996), and *Oliver v. U.S. Dep't of Justice*, 517 F.2d

426 (2d Cir. 1975)).  Hence, to the extent that *Asemani* expanded the definition of "national of

the United States" to include those who have merely *applied* for citizenship, that decision is no

longer in accord with the current state of the law.  *See, e.g.*, *Lin*, 561 F.3d at 508.

    The decision in *Peterson* is similarly distinguishable from the instant case.  The plaintiffs

describe *Peterson* as "holding that even a citizen of another country can satisfy the 'national of

the United States' requirement of FSIA by simply demonstrating his allegiance."  Pls.' Mem. at

19.  That description, however, is misleading and far too broad.  *Peterson* narrowly held that a

member of the U.S. armed forces who was killed while serving abroad qualified as a "national of

the United States" under the FSIA.  *See Peterson*, 515 F. Supp. 2d at 40 n.4.  None of the

plaintiffs was a member of this country's armed forces at the time the defendants perpetrated the

alleged acts of torture and extrajudicial killing, and as a result the plaintiffs cannot rely on

*Peterson* to render them "nationals of the United States."[16]   Furthermore, if there were any ambiguity in *Peterson*'s statement that the decedent's membership in the armed forces "establishes beyond any doubt that [his] allegiance to the United States was permanent," *id.*, the D.C. Circuit has since clarified that "manifestations of 'permanent allegiance' do not, by themselves, render a person a U.S. national," *Lin*, 561 F.3d at 508; *see also id.* ("[A]ttitudes of permanent allegiance do not help Appellants.").   Hence, although some of the plaintiffs may have had attitudes or feelings of "permanent allegiance" prior to 2006, *see* Pls.' Mem. at 19–20, those attitudes and feelings do not qualify them as "nationals of the United States."  *Accord In re Navas-Acosta*, 23 I. & N. Dec. 586, 587–88 (B.I.A. 2003) (holding that "whether one 'owes permanent allegiance to the United States' is not simply a matter of individual choice," but rather "it reflects a legal relationship between an individual and a sovereign").

## 2.   *The Acts Underlying the Plaintiffs' FSIA Claims are Not Ongoing.*

The plaintiffs also argue that this Court has jurisdiction over their FSIA claims because, even if the plaintiffs were not nationals of the United States from 1999–2006 when Akbar and Manouchehr were in prison, the "Defendants have continued to harass *and torture* the Plaintiffs" through the present day.   *See* Pls.' Mem. at 20 (emphasis added).   As discussed above, the FSIA's terrorism exception requires either the claimant or the victim to have been, *inter alia*, a national of the United States "at the time the act described in paragraph (1) occurred."  *See* 28 U.S.C. § 1605A(a)(2)(A)(ii).   Such acts include "torture" and "extrajudicial killing," which are

---

[16] Despite the fact that *Peterson*'s reading of the term "national" is contrary to more recent precedent from the D.C. Circuit, *see Lin*, 561 F.3d at 508, the *Peterson* holding is nevertheless still consistent with the current text of the FSIA.   The current version of the FSIA terrorism exception—enacted in 2008, after *Peterson* was decided— expanded the scope of claimants and victims who can sue under the terrorism exception.   In particular, the current version confers jurisdiction if the claimant or the victim of the foreign state's actions was, *inter alia*, "a member of the armed forces" at the time of the event underlying the claim.  *See* 28 U.S.C. § 1605A(a)(2)(A)(ii).

the only listed acts that could plausibly apply to the facts of this case.[17]   Hence, the plaintiffs'

argument is that they continue to be "tortured" by Iran due to the harassment and threats that

they have endured since relocating to the United States.  *See* Pls.' Mem. at 20; *see also* Tr. of

Evidentiary Hr'g at 5:21–22 ("[T]hey continue to be harassed, in effect, mentally tortured and

harmed."); *id.* at 16:6–9 ("We would submit that continuing death threats, that you continue to

speak out and you will be kidnapped, tortured—killed does fall within that definition of

'torture.'").

The FSIA's terrorism exception defines "torture" with reference to the definition of that

term contained in section 3 of the Torture Victim Protection Act ("TVPA").  *See* 28 U.S.C.

§ 1605A(h)(7).  That provision defines torture as:

> any act, directed against an individual in the offender's custody or physical
> control, by which severe pain or suffering . . . whether physical or mental, is
> intentionally inflicted on that individual for such purposes as obtaining from that
> individual or a third person information or a confession, punishing that individual
> for an act that individual or a third person has committed or is suspected of having
> committed, intimidating or coercing that individual or a third person, or for any
> reason based on discrimination of any kind.

28 U.S.C. § 1350 note, sec. 3(b)(1).  The plaintiffs contend that the harassment and threats they

have endured fall within this definition of torture because they "feel they cannot escape the

ceaseless, barbaric grip of the Defendants."  *See* Pls.' Mem. at 20; *see also* Tr. of Evidentiary

Hr'g at 20:7–21:14.  The Court does not doubt that the plaintiffs continue to live in fear of the

Iranian government and whatever agents that government may deploy to monitor the plaintiffs'

movements and activities within the United States.   The FSIA requires, however, that the

plaintiff be "in the offender's custody or physical control" at the time the "severe pain or

suffering" is inflicted.  *See* 28 U.S.C. § 1350 note, sec. 3(b)(1); *id.* § 1605A(h)(7).  None of the

---

[17] The other acts that qualify are "aircraft sabotage" and "hostage taking."  *See* 28 U.S.C. § 1605A(a)(1).

plaintiffs has been in Iran's "custody or physical control" since Manouchehr was released from prison in July or August 2006.

Plaintiffs' counsel has presented creative arguments to get around this statutory requirement by contending at the evidentiary hearing that the defendants' alleged ongoing monitoring and harassment of the plaintiffs renders them "in effect, still within the custody in a broader sense of this regime, which is threatening to kill them." *See* Tr. of Evidentiary Hr'g at 20:19–21. That sense of "custody," however, is far broader than the text of the statute would allow. The plain language of the statute contemplates only *physical*, as opposed to constructive or psychological, custody or control. *See, e.g.*, *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 70–71 (D.D.C. 2010) (holding that terrorist bombing was not "torture" under the FSIA because the perpetrators "did not kidnap or imprison the [victims]," but rather "the contact between Iranian agents and the victims in this case was fleeting—only the time it took to drive an explosives-laden truck into a building"). The plaintiffs further cite no authority for the problematic proposition that verbal or electronic harassment can qualify as "torture" under the FSIA, even when such harassment arguably causes severe emotional and psychological damage.[18] The Court thus rejects the plaintiffs' novel interpretation of the term "torture," as it is used in the FSIA and defined in the TVPA.

Since neither the claimants nor the non-plaintiff victim (Akbar) were "nationals of the United States" from 1999–2006, during which time the defendants perpetrated the relevant acts of torture and extrajudicial killing, the plaintiffs do not satisfy the jurisdictional requirements of the FSIA's terrorism exception. As a result, the Court lacks subject-matter jurisdiction over any

---

[18] Indeed, the plaintiff's broad reading of the term "torture" is contrary to the D.C. Circuit's holding that acts of torture must be "sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Price*, 294 F.3d at 92. It would significantly dilute the concept of "torture" if that word encompassed sporadic verbal or electronic harassment, particularly since "torture does not automatically result whenever individuals in official custody are subject even to direct physical assault." *Id.* at 93.

claims against the two "foreign state" defendants: the Islamic Republic of Iran and the Revolutionary Guard.[19]

### B.   The Court Lacks Subject-Matter Jurisdiction Over the Plaintiffs' Alien Tort Statute Claims

In their supplemental briefing, the plaintiffs contend that "[j]urisdiction over claims against Defendants lies in the Alien Tort Claims Act," *see* Pls.' Mem. at 4, also known as the Alien Tort Statute ("ATS").   That statute provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  The Supreme Court has held that the ATS is "strictly jurisdictional . . . . in the sense of addressing the power of the [federal] courts to entertain cases concerned with a certain subject." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713–14 (2004).  More particularly, the ATS "allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law."  *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013).

In *Kiobel*, the Supreme Court addressed the question of "whether and under what circumstances courts may recognize a cause of action under the [ATS], for violations of the law of nations occurring within the territory of a sovereign other than the United States." *Id.* at 1662 (majority opinion).  After examining the text and "historical background" of the statute, *see id.* at 1665–68, the Court held that "the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption," *id.* at 1669.  Set against that presumption, the Supreme Court held that the "petitioners' case seeking relief for violations of the law of nations occurring outside the United States [was] barred." *Id.*

---

[19] Since the Court concludes that neither the plaintiffs nor their deceased brother satisfy the FSIA's requirement of being "nationals of the United States" at the time that the acts of torture and extrajudicial killing occurred, the Court need not address whether the plaintiffs "afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."  *See* 28 U.S.C. § 1605A(a)(2)(A)(iii).

In *Kiobel*, the Nigerian petitioners were suing two foreign holding companies under the ATS—Royal Dutch Petroleum Company, incorporated in the Netherlands, and Shell Transport and Trading Company, incorporated in England—as well as their joint subsidiary, Shell Petroleum Development Company ("SPDC"), which was incorporated in Nigeria and engaged in oil exploration and production in a tribal region of Nigeria called Ogoniland.  *See id.* at 1662. The petitioners were residents of Ogoniland, and they alleged that "after concerned residents of Ogoniland began protesting the environmental effects of SPDC's practices, respondents enlisted the Nigerian Government to violently suppress the burgeoning demonstrations."  *Id.*   In particular, the petitioners claimed that "[t]hroughout the early 1990's . . . Nigerian military and police forces attacked Ogoni villages, beating, raping, killing, and arresting residents and destroying or looting property."  *Id.*; *see also id.* at 1663 (listing allegations of petitioners as including, *inter alia*, "extrajudicial killings . . . crimes against humanity . . . [and] torture"). Further, the petitioners alleged that the respondent companies "aided and abetted these atrocities by, among other things, providing the Nigerian forces with food, transportation, and compensation, as well as by allowing the Nigerian military to use respondents' property as a staging ground for attacks."  *Id.* at 1662–63.

According to the *Kiobel* Court, the petitioners' claims were predicated entirely on "relevant conduct [that] took place outside the United States."  *Id.* at 1669; *see also id.* at 1678 (Breyer, J., concurring) (observing that "[t]he plaintiffs are not United States nationals . . . [and] [t]he conduct at issue took place abroad").   Additionally, although both of the corporate defendants were incorporated abroad, they had affiliates located in the United States.  *See id.* at 1677 (Breyer, J., concurring) (observing that respondents had "an office in New York City . . . owned by a separate but affiliated company"); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226

F.3d 88, 93 (2d Cir. 2000) (stating that *Kiobel* respondents "own subsidiary companies that do business in the United States"). The Supreme Court majority, per the opinion of Chief Justice Roberts, held, however, that the petitioners' claims against these corporate defendants did not "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application," and therefore those claims did not establish jurisdiction under the ATS. *See Kiobel*, 133 S. Ct. at 1669 (majority opinion).[20]

The Supreme Court in *Kiobel* also "le[ft] open a number of significant questions regarding the reach and interpretation of the [ATS]." *Id.* (Kennedy, J., concurring); *see also id.* at 1669–70 (Alito, J., concurring) (noting the majority's "narrow approach," which "obviously leaves much unanswered"). In particular, the Supreme Court hinted as to what type of conduct occurring entirely abroad might confer jurisdiction under the ATS. As discussed above, Chief Justice Roberts's opinion for the majority left open the possibility that conduct that "touch[es] and concern[s] the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application" may confer jurisdiction for ATS claims arising out of conduct occurring abroad. *Id.* (majority opinion).[21] Also, Justice Kennedy implied that certain "serious violations of international law principles protecting persons" may rebut the presumption against extraterritorial application, or at least would "require some further elaboration and explanation" of that presumption in ATS cases. *See id.* (Kennedy, J., concurring). Justice Alito, joined by Justice Thomas, wrote that "a putative ATS cause of action

---

[20] The *Kiobel* majority also specified in this regard that the presumption against extraterritoriality is not displaced by "mere corporate presence" in the United States by the alleged offender. *See Kiobel*, 133 S. Ct. at 1669.

[21] *See, e.g.*, *Mwani v. bin Laden*, No. 99-125, 2013 WL 2325166, at *3–4 (D.D.C. May 29, 2013) (finding presumption against extraterritoriality rebutted in ATS case, post-*Kiobel*, where bombing of U.S. embassy in Kenya "impinged the diplomatic mission of the United States," "directly infringed on the rights of ambassadors," the events at issue "were directed at the United States government, with the intention of harming this country and its citizens," and perpetrators of attack "were involved in an ongoing conspiracy to attack the United States, and overt acts in furtherance of that conspiracy took place within the United States").

will fall within the scope of the presumption against extraterritoriality—and will therefore be barred—unless the domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance." *Id.* at 1670 (Alito, J., concurring); *see also Sosa*, 542 U.S. at 732 ("[F]ederal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATS] was enacted."). Finally, Justice Breyer's concurring opinion, joined by three other Justices, stated that the ATS would provide jurisdiction where, *inter alia*, "the defendant is an American national" or "the defendant's conduct substantially and adversely affects an important American national interest, [including] a distinct interest in preventing the United States from becoming a safe harbor (free of civil as well as criminal liability) for a torturer or other common enemy of mankind." *Id.* at 1674 (Breyer, J., concurring); *see also id.* ("I would interpret the [ATS] as providing jurisdiction only where distinct American interests are at issue.").[22]

Despite these hints, all nine Justices agreed that jurisdiction was lacking on the facts of *Kiobel* itself. Even though the respondents in *Kiobel* had American corporate affiliates and allegedly orchestrated and incited heinous actions against the Nigerian petitioners (including extrajudicial killing, torture, and crimes against humanity), the Supreme Court concluded that there was not a sufficient nexus to the territory or interests of the United States to confer ATS jurisdiction.[23] In other words, the Supreme Court appears to have set a very high bar for plaintiffs asserting jurisdiction under the ATS for claims arising out of conduct occurring

---

[22] Justice Breyer framed this conclusion by stating at the outset that prior Supreme Court precedent "essentially leads today's judges to ask: Who are today's pirates?" and concluding that "[c]ertainly today's pirates include torturers and perpetrators of genocide." *Kiobel*, 133 S. Ct. at 1671–72 (Breyer, J., concurring).

[23] In this regard, Justice Breyer wrote: "[T]he plaintiffs allege, not that the defendants directly engaged in acts of torture, genocide, or the equivalent, but that they helped others (who are not American nationals) to do so." *Kiobel*, 133 S. Ct. at 1678 (Breyer, J., concurring).

entirely abroad.[24]   Hence, although the conduct underlying the plaintiffs' claims against the Islamic Republic of Iran and the Revolutionary Guard in the instant case are undoubtedly egregious, they do not meet the threshold set out in *Kiobel*.   In addition, to the extent that the plaintiffs seek to pursue claims under the ATS against defendants Ahmadinejad and Khamenei— the president and Supreme Leader of Iran, respectively—for conduct that occurred entirely within the sovereign territory of Iran, those claims are also barred under the holding of *Kiobel*. As a result, the Court does not have subject-matter jurisdiction to hear such claims, and they must be dismissed.

###   C.   Defendants Khamenei and Ahmadinejad Are Not Real Parties in Interest

The foregoing discussion has narrowed the scope of this action considerably.   The only claims that arguably remain within the Court's subject-matter jurisdiction are the plaintiffs' claims under the TVPA and the plaintiffs' common-law tort claims, but only insofar as these claims are pled against the individual defendants Khamenei and Ahmadinejad.[25]

Although the Court lacks subject-matter jurisdiction over Iran and the Revolutionary Guard, Khamenei and Ahmadinejad are not similarly shielded by foreign sovereign immunity. *See Samantar*, 130 S. Ct. at 2283 n.3 ("[W]e hold that the FSIA does not govern whether an individual foreign official enjoys immunity from suit . . . .").   In *Samantar*, the Supreme Court

---

[24] Related to this issue, five days after the Supreme Court decided *Kiobel*, the Court vacated a decision in a case called *Rio Tinto PLC v. Sarei* and remanded the case "for further consideration in light of [*Kiobel*]."   *See* No. 11-649, 2013 WL 1704704, at *1 (U.S. Apr. 22, 2013).   In that case, an *en banc* panel of the Ninth Circuit Court of Appeals held, over a number of full-throated dissenting opinions, that it had jurisdiction over claims of genocide and war crimes brought pursuant to the ATS, and which arose out of an uprising in Papua New Guinea against a mining company that resulted in many deaths.   *See Sarei v. Rio Tinto, PLC*, 671 F.3d 736 (9th Cir. 2011) (en banc).

[25] The Court construes the plaintiffs' claim in the Third Amended Complaint for "Engaging in Terrorism and/or Providing Material Support to a Terrorist Organization" as a claim under the ATS.   *See* TAC ¶¶ 30–46.   Even if such a claim were not barred by *Kiobel*, the plaintiffs have presented no evidence in this case to support the allegation that the defendants "knowingly and substantially assisted Al Qaeda, Hezbollah, Taliban, and other terrorist groups and nation states and their collaborators to commit acts that violate clearly established international law norms."   *See id.* ¶ 45.   Indeed, the plaintiffs have demonstrated no connection between their injuries and the actions of terrorist groups such as al Qaeda and Hezbollah.

held that the FSIA does not apply to claims brought against individual officials of a foreign

sovereign.  *See id.*  Instead, the Court held that common-law foreign sovereign immunity

principles should be applied to determine whether a particular official is entitled to immunity.

*See id.* at 2284, 2289 ("[W]e do not think that the [FSIA] codified the common law with respect

to the immunity of individual officials."); *see also id.* at 2292 ("[W]e think this case, in which

respondents have sued petitioner in his personal capacity and seek damages from his own

pockets, is properly governed by the common law because it is not a claim against a foreign state

as the Act defines that term.").

One of the specific concerns that *Samantar* discussed in arriving at this holding was "the

risk that plaintiffs may use artful pleading to attempt to select between application of the FSIA or

the common law."  *Id.* at 2292.  The Supreme Court dismissed these concerns by pointing out all

of the hurdles faced by plaintiffs seeking to bring claims against individual foreign officials.  *See

id.*  One of the hurdles discussed in *Samantar* was that "it may be the case that some actions

against an official in his official capacity should be treated as actions against the foreign state

itself, as the state is the real party in interest."  *Id.*  In support of this statement, the *Samantar*

Court cited the statement from *Kentucky v. Graham* that "an official-capacity suit is, in all

respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the

official personally, for the real party in interest is the entity."  473 U.S. 159, 166 (1985) (citation

omitted).  The question left open by *Samantar*, however, is which category of "actions against an

official in his official capacity should be treated as actions against the foreign state itself."  *See

Samantar*, 130 S. Ct. at 2292.  Without attempting to delineate the precise contours of this

category of cases, the Court concludes that in *this* case the foreign state of Iran is the real party in

interest, not Khamenei or Ahmadinejad.

The plaintiffs make clear, both in their Third Amended Complaint and in their briefing, that they are suing defendants Khamenei and Ahmadinejad in their official, as opposed to their personal, capacities.  *See* Pls.' Mem. at 22 ("These officials, *acting in their official capacity,* authorized the torture and murder of Akbar Mohammadi as well as the torture of his brother Manouchehr." (emphasis added)); TAC ¶ 55 ("Defendants and their agents were *acting within the scope of their office, employment or agency in committing the acts alleged herein,* including the planning and torture and murder of the [sic] Akbar Mohammadi and the torture and intimidation his family suffered and continues to endure in the United States." (emphasis added)).  It is apparent that the plaintiffs' theory of this case is that any actions taken by Khamenei and Ahmadinejad's were actions of the Iranian "regime."  *See, e.g.*, TAC ¶ 28 ("This was an effort by the Defendants to destroy a family and let everyone else know that torture, infliction of severe physical and mental pain, and death are imminent realities to all those who fight against [Iran's] tyrannical regime."); *see also* Pls.' Mem. at 7–12 (contending that this Court has personal jurisdiction over Khamenei and Ahmadinejad as a result of "the regime['s]" contacts with the United States).  This theory also fits with the nature of the allegations in this case, which are essentially that Akbar and Manouchehr were imprisoned, tortured, and in Akbar's case killed through state actions performed at the direction of Khamenei and Ahmadinejad.  *See, e.g.*, TAC ¶ 23 ("The prison guards and other agents of the government acted on direct orders from the Defendants and carried out their official policies of repression, brutality, torture, intimidation, and murder upon those they deemed enemies of their tyrannical government.").  As a result, the Court concludes that the Islamic Republic of Iran is the "real party in interest" in this action, and therefore the claims pled against defendants Khamenei and Ahmadinejad will be treated as claims against Iran itself.  *See Samantar*, 130 S. Ct. at 2292;

*Graham*, 473 U.S. at 166; *accord Odhiambo v. Republic of Kenya*, No. 12-0441, 2013 WL 953432, at *14–15 (D.D.C. Mar. 13, 2013) (dismissing claims against individual defendants where "the suit [was] in all respects a suit against the Kenyan government").

The necessary result of this conclusion is that all of the plaintiffs' claims must be dismissed for lack of subject-matter jurisdiction because the plaintiffs cannot demonstrate that any of the enumerated exceptions to immunity contained in the FSIA apply to this case. *See supra* Part III.A.[26]

---

[26] Although the Court dismisses this case on subject-matter jurisdiction grounds, there is also a serious question as to whether the Court has personal jurisdiction over any of the defendants. As already discussed, the service performed by the plaintiffs under the FSIA and the Federal Rules of Civil Procedure appear to have numerous defects. *See supra* note 11. Deficient service alone would be enough to deprive the 'Court of personal jurisdiction over all of the defendants. *See, e.g.*, *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.* 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."). Beyond the service issues, however, there is a serious question as to whether the exercise of personal jurisdiction over defendants Khamenei and Ahmadinejad would be "consistent with the United States Constitution and laws." *See* FED. R. CIV. P. 4(k).

"Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani*, 417 F.3d at 11. Due process demands that, in order to exercise jurisdiction over a non-resident defendant, that defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Due process also "requir[es] that individuals have 'fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)). "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum," and "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* (footnote, citations, and internal quotation marks omitted).

In the instant case, the plaintiffs have not established that Khamenei and Ahmadinejad have had "minimum contacts" with the United States or that they have "purposefully directed" their activities here. As the plaintiffs point out, the D.C. Circuit has approved of personal jurisdiction in a situation where a terrorist leader and his terrorist organization "orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but *to cause pain and sow terror in the embassy's home country*." *See Mwani*, 417 F.3d at 13 (emphasis added). The defendants in *Mwani* were also engaged in "an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders." *Id.* In an earlier case, however, the D.C. Circuit made clear that "tortur[ing] two American citizens in Libya" was "insufficient to satisfy the usual 'minimum contacts' requirement." *See Price*, 294 F.3d at 95. Thus, "[t]he *Price* and *Mwani* opinions, read together, suggest that acts of terror or torture committed against American citizens abroad, *standing alone*, can support personal jurisdiction only if the defendant expressly intended the effects of the act to be felt in the United States." *Nikbin*, 471 F. Supp. 2d at 73 (emphasis in original). The plaintiffs in the instant case have not presented evidence that any of the defendants' actions that took place in Iran were "expressly intended" to have effects felt in the United States. *See id.*

IV.    **CONCLUSION**

For the reasons discussed above, the Court concludes that it lacks subject-matter

jurisdiction over the plaintiffs' claims, and as a result the Court must dismiss this case for lack of

jurisdiction.

An appropriate Order accompanies this Memorandum Opinion.

Date: May 31, 2013

/s/ *Beryl A. Howell*
_____
BERYL A. HOWELL
United States District Judge

---

Arguably, the Court could still exercise personal jurisdiction over Khamenei and Ahmadinejad with respect to the plaintiffs' intentional infliction of emotional distress ("IIED") claims because, according to the plaintiffs, they continue to be harassed and threatened in the United States by agents of "the Iranian regime," who "operate in this forum and are under the direct orders of [Khamenei and Ahmadinejad]." *See* Pls.' Mem. at 10–11.  Based on the plaintiffs' allegation that "the Iranian regime's continued presence in their lives have left Plaintiffs unable to function as human beings," *see* TAC ¶ 28, it is not out of the question that at least some portion of the plaintiffs' IIED claim arises out of the "Iranian regime's" ongoing contacts with the United States. *See, e.g.*, *Calder v. Jones*, 465 U.S. 783, 789–91 (1984).  Even assuming this theory of personal jurisdiction were viable on the facts of this case, it would be insufficient to confer personal jurisdiction over Khamenei and Ahmadinejad.  Although the plaintiffs have established that they continue to be harassed and threatened by "the Iranian regime" in the United States, the plaintiffs have not presented sufficient evidence to support the conclusion that any actions directed at the United States were carried out with the *personal* involvement of either Khamenei or Ahmadinejad.  The plaintiffs have presented evidence that Khamenei and Ahmadinejad directed more significant acts, such as detention, torture, and killing of political dissidents, but the plaintiffs have not shown that Khamenei and Ahmadinejad were personally involved in less significant actions, such as threatening phone calls and computer hacking.  These less significant actions were the ones allegedly carried out in the United States against the plaintiffs.  Without sufficient facts connecting the ongoing harassment of the plaintiffs *in the United States* with the *personal* conduct of Khamenei or Ahmadinejad, it is doubtful that the Court would be able to exercise personal jurisdiction over Khamenei or Ahmadinejad consistent with the Due Process Clause.