**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MANOUCHEHR MOHAMMADI, *et al.*,

        Plaintiffs,

        v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

        Defendants.

Civil Action No. 09-1289 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Pending before the Court is the plaintiffs' motion for reconsideration regarding the Court's decision dismissing this case for lack of subject-matter jurisdiction. Also pending before the Court is the plaintiffs' related motion for leave to file a fourth amended complaint. In their motion for reconsideration, the plaintiffs vociferously contend that this Court has committed clear error in analyzing the bounds of its jurisdiction. The plaintiffs are also convinced that, unless this Court "find[s] a legal basis to side with the victims," the result will be "the general collapse of the judicial institution" and "would lead many to question this government's true devotion to safeguarding basic human rights." *See* Pls.' Mot. Recons. ("Pls.' Recons. Mem.") at 2–3, ECF No. 45. The plaintiffs argue that "this Court must not and cannot forsake the issue of human rights and crimes against humanity by dismissing this case . . . as a result of a minor and unjustifiable 'technicality.'" *Id.* at 3.

That the plaintiffs invoke platitudes of the rule of law as the basis for their motion, however, is deeply ironic. Indeed, their characterization of this Court's jurisdiction as a "technicality," *see* Pls.' Recons. Mem. at 3, is at odds with the very notion of legitimate, democratic governance that they purport to vindicate. "Federal courts cannot reach out to award remedies when the Constitution or laws of the United States do not support a cause of action."

*Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 74 (1992).  The limitations on the jurisdiction of federal courts "are an essential ingredient of separation and equilibration of powers" in our system of government, and those limitations cannot be brushed aside as mere technicalities.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998).

Our Founders conceived of the judicial branch "to have neither FORCE nor WILL, but merely judgment," such that the courts do not "on the pretense of a repugnancy . . . substitute their own pleasure to the constitutional intentions of the legislature."  THE FEDERALIST NO. 78 (Alexander Hamilton).  Thus, "the authority of the judicial department" under the Constitution was "carefully restricted to those causes which are manifestly proper for the cognizance of the national judicature."  THE FEDERALIST NO. 81 (Alexander Hamilton).  "To avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them."  THE FEDERALIST NO. 78 (Alexander Hamilton).  This properly limited role for the judiciary is anchored by the separation of powers.  As Hamilton observed at the time of the Founding, "liberty can have nothing to fear from the judiciary alone, but would have every thing to fear from [the judiciary's] union with either of the other departments."  *Id.*  Hence, the separation of powers, embodied by the creation of courts of limited jurisdiction, is what imbues our government with its legitimacy and enduring stability.  It is not the province of this Court (or any court) to upset that constitutional scheme.  For the reasons discussed below, the Court denies the plaintiffs' motions.

## I.      BACKGROUND

The Court has previously discussed the factual background of this case in its previous memorandum opinion, which the Court incorporates fully here.  *See Mohammadi v. Islamic*

2

*Republic of Iran*, No. 09-1289, 2013 WL 2370594, at *1–4 (D.D.C. May 31, 2013). Prior to issuing its memorandum opinion dismissing this case, the Court provided the plaintiffs with numerous opportunities to establish the subject-matter jurisdiction of the Court. First, the Court alerted plaintiffs' counsel, prior to the evidentiary hearing held on April 4, 2013, that counsel would be asked to address the basis of the Court's subject-matter jurisdiction, including specifically "whether [28 U.S.C. §§ 1605(a)(5) and 1605(a)(7)] purport to apply to all defendants or only defendants Ahmadinejad and Khamenei," and "whether the plaintiffs satisfy the statutory requirements for jurisdiction outlined in the [Foreign Sovereign Immunities Act]." *See* Order dated Apr. 1, 2013, ECF No. 28. Next, the Court provided plaintiffs' counsel with a full opportunity to assert bases for the jurisdiction of this Court at oral argument prior to the evidentiary hearing. *See* Tr. of Evidentiary Hr'g at 4:5–26:13 (Apr. 4, 2013), ECF No. 47. Finally, the Court provided the plaintiffs nearly a month after the evidentiary hearing concluded to file "any further submissions related to the Court's subject-matter jurisdiction over this action, the Court's personal jurisdiction over the defendants, the liability of the defendants, or the damages sought by the plaintiffs." *See* Minute Order dated Apr. 15, 2013. The plaintiffs accordingly filed several memoranda following the evidentiary hearing, including a twenty-two page legal memorandum purportedly "demonstrating jurisdiction over the Defendants in the above styled case." *See* Supp. Legal Mem. on Jurisdiction & Related Issues ("Pls.' Jurisdiction Mem.") at 1, ECF No. 40.

Based on this memorandum, the evidence and argument presented at the evidentiary hearing, and the allegations of the operative complaint (the Third Amended Complaint, ECF No. 42), the Court held in its May 31, 2013 memorandum opinion that it lacked subject-matter jurisdiction to grant the plaintiffs the relief that they sought against the defendants because the

defendants are shielded by sovereign immunity against the plaintiffs' claims.  *See, e.g.*, *Mohammadi*, 2013 WL 2370594, at *7 ("[T]he Court lacks subject-matter jurisdiction over the plaintiffs' claims in this matter, and therefore the Court does not have the authority to grant the plaintiffs the default judgment that they seek.").  That holding was premised on several legal conclusions.

First, the Court held that the plaintiffs had not established that defendants Iran and the Revolutionary Guard—which are "foreign states" under the Foreign Sovereign Immunities Act ("FSIA")—were subject to suit under the state-sponsored terrorism exception to immunity, as codified in the FSIA, 28 U.S.C. § 1605A.  *See id.* at *13.  That conclusion was based on the fact that (1) none of the plaintiffs were "nationals of the United States" at the time that the alleged acts of terrorism (*i.e.*, torture and extra-judicial killing) were carried out; and (2) the acts of torture and extra-judicial killing were not ongoing, but instead were limited in time to the torture and extra-judicial killing that took place in Tehran between 1999 and 2006.  *See id.* at *9–13. Second, the Court held that it lacked subject-matter jurisdiction over the plaintiffs' Alien Tort Statute ("ATS") claims under the Supreme Court's recent interpretation of that statute in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).  *See Mohammadi*, 2013 WL 2370594, at *13–15.  Third, the Court held that, since the plaintiffs only alleged official-capacity claims against defendants Ayatollah Sayid Ali Hoseyni Khamenei and Mahmoud Ahmadinejad, under well-established legal principles, those claims were against Iran itself, and thus were likewise barred by sovereign immunity.  *See id.* at *15–16.  Finally, the Court discussed at length its serious doubts about whether it could exercise personal jurisdiction over any of the defendants— both because they lacked minimum contacts with the United States and because service of process was likely insufficient.  *See id.* at *4 n.11; *id.* at *16 n.26.  The Court did not hold that it

lacked personal jurisdiction, since the case was dismissed on alternative jurisdictional grounds, *see id.* at *16 n. 26, but it was clear from the Court's opinion that the plaintiffs had failed in several respects to establish the requisite basis for personal jurisdiction.

On June 17, 2013, the plaintiffs filed a motion for reconsideration of the Court's decision under Federal Rules of Civil Procedure 59(e) and 60(b). *See* Pls.' Recons. Mem. at 11. That same day, the plaintiffs also filed a motion for leave to file a fourth amended complaint, which sought to add to the complaint "additional facts regarding Plaintiffs' citizenship and permanent resident status" and to "conform[] to jurisdictional provisions pled in Plaintiffs' prior complaints that provide this Court with subject matter jurisdiction, including subject matter jurisdiction pursuant to 28 U.S.C. § 1605(a)(5)." Pls.' Mot. to File Fourth Am. Compl. at 2, ECF No. 46.

## II. LEGAL STANDARDS

### A. <u>Motions to Alter or Amend a Judgment</u>

"As a general matter, courts treat a motion for reconsideration as originating under Rule 59(e) if it is filed within 28 days of the entry of the order at issue and as originating under Rule 60(b) if filed thereafter." *Owen-Williams v. BB & T Inv. Servs., Inc.*, 797 F. Supp. 2d 118, 121–22 (D.D.C. 2011) (footnote omitted).[1] Reconsideration of a final judgment is "an extraordinary remedy which should be used sparingly." *United States v. Philip Morris Inc.*, 130 F. Supp. 2d

---

[1] "The standards that govern Rule 60(b) are even more restrictive" and "'in most cases, the bar stands even higher for a party to prevail on a Rule 60(b) motion for relief from judgment' than on a Rule 59(e) motion." *Taitz v. Obama*, 754 F. Supp. 57, 58 (D.D.C. 2010) (quoting *Uberoi v. EEOC*, 271 F. Supp. 2d 1, 2 (D.D.C. 2002)). This is because, as the D.C. Circuit has observed, Rule 60(b) "sets forth a litany of grounds establishing a high bar for modification." *United States v. Philip Morris USA Inc.*, 686 F.3d 839, 843 (D.C. Cir. 2012). Indeed, the only two provisions of Rule 60(b) that arguably apply in this case are 60(b)(1) and 60(b)(6), which allow relief from a final judgment for "mistake, inadvertence, surprise, or excusable neglect" and "any other reason that justifies relief," respectively. *See* FED. R. CIV. P. 60(b). The D.C. Circuit has said that "[r]elief under Rule 60(b)(1) is rare" because that rule "allow[s] district courts to correct only limited types of substantive errors." *Hall v. CIA*, 437 F.3d 94, 99 (D.C. Cir. 2006); *see also D.C. Fed'n of Civic Ass'ns v. Volpe*, 520 F.2d 451, 453 (D.C. Cir. 1975) (granting relief under Rule 60(b)(1) where the district court's order "was inconsistent with an intervening decision of [the D.C. Circuit]"). Similarly, "the Supreme Court cases have required a movant seeking relief under Rule 60(b)(6) to show 'extraordinary circumstances justifying the reopening of a final judgment.'" *See Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1116 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 534 (2005)).

96, 99 (D.D.C. 2001).  "Rule 59(e) permits a court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'"  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (citation omitted).  This is because "'Rule 59(e) motions are aimed at reconsideration, not initial consideration.'"  *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 812 (D.C. Cir. 2012) (quoting *District of Columbia v. Doe*, 611 F.3d 888, 896 (D.C. Cir. 2010)).

"It is well settled that an issue presented for the first time in a motion pursuant to Federal Rule of Civil Procedure 59(e) generally is not timely raised; accordingly, such an issue is not preserved for appellate review unless the district court exercises its discretion to excuse the party's lack of timeliness and consider the issue."  *Doe*, 611 F.3d at 896 (internal quotation marks omitted); *accord GSS Group*, 680 F.3d at 812 (holding that arguments raised for the first time on a Rule 59(e) motion "are waived"); *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012) ("Rule 59(e) is not a vehicle to present a new legal theory that was available prior to judgment . . . .").  "A district court," however, "does not open the door to further consideration of a forfeited claim by giving an alternative, merits-based reason for rejecting it."  *GSS Group*, 680 F.3d at 813.  A Rule 59(e) motion is not "a chance for [a party] to correct poor strategic choices," *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 15 (D.D.C. 2010), nor are such motions to be used by litigants "to cry over spilled milk," *Bond v. U.S. Dept. of Justice*, 286 F.R.D. 16, 17 (D.D.C. 2012).  "The strictness with which such motions are viewed is justified by the need to protect both the integrity of the adversarial process in which parties are expected to bring all arguments before the court, and the ability of the parties and others to rely on the finality of judgments."  *CFTC v. McGraw-Hill Cos.*, 403 F. Supp. 2d 34, 36 (D.D.C. 2005);

*accord Silk v. Sandoval*, 435 F.2d 1266, 1268 (1st Cir. 1971) (acknowledging "the complementary interest in speedy disposition and finality, clearly intended by Rule 59").

There are, however, extraordinary circumstances in which granting a Rule 59(e) motion is warranted. As the D.C. Circuit has repeatedly held, "'[a] Rule 59(e) motion . . . need not be granted unless the district court finds that there is [1] an intervening change of controlling law, [2] the availability of new evidence, or [3] the need to correct a clear error or prevent manifest injustice.'" *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). "Although Courts have not generally defined what constitutes 'clear error' under Rule 59(e), . . . clear error should conform to a 'very exacting standard.'" *Bond*, 286 F.R.D. at 22 (citation omitted) (quoting *Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414, 422 (D.D.C. 2005)). "[A] final judgment must be 'dead wrong' to constitute clear error." *Lardner v. FBI*, 875 F. Supp. 2d 49, 53 (D.D.C. 2012) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)). Indeed, the Seventh Circuit has vividly observed that "[t]o be clearly erroneous, a decision must strike [a court] as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Electric Motors*, 866 F.2d at 233. Hence, *a fortiori*, "'[m]ere disagreement does not support a Rule 59(e) motion.'" *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002) (quoting *Hutchinson v. Staton*, 994 F.2d 1076, 1082 (4th Cir. 1993)).

Similarly, although "[t]he term 'manifest injustice' eludes precise definition," *Roane v. Gonzales*, 832 F. Supp. 2d 61, 64 (D.D.C. 2011), it is clear that "manifest injustice" is an exceptionally narrow concept in the context of a Rule 59(e) motion. The D.C. Circuit has observed that, under Rule 59(e), "manifest injustice does not exist where . . . a party could have

easily avoided the outcome, but instead elected not to act until after a final order had been entered." *Ciralsky*, 355 F.3d at 665 (internal quotation marks omitted).  In a slightly different context, the Circuit has said that manifest injustice arises from "rulings that upset settled expectations—expectations on which a party might reasonably place reliance."  *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007).  These cases make clear that a manifest injustice does not result merely because a harm may go unremedied.  *Accord Associated Gen. Contractors of Cal., Inc. v. Cal. State. Council of Carpenters*, 459 U.S. 519, 536 (1983) ("[T]he judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing.").  Synthesizing these precedents with the phrase's plain language, "manifest injustice" must entail at least (1) a clear and certain prejudice to the moving party that (2) is fundamentally unfair in light of governing law.

### B.  Amending a Complaint After Final Judgment

Federal Rule of Civil Procedure 15 provides that, if more than twenty-one days have passed since the filing of an original complaint, "a party may amend its [complaint] only with the opposing party's written consent or the court's leave."  FED. R. CIV. P. 15(a)(2).  "The court should freely give leave when justice so requires."  *Id.*  The D.C. Circuit has held, however, that "once a final judgment has been entered, a court cannot permit an amendment unless the plaintiff 'first satisfies Rule 59(e)'s more stringent standard' for setting aside the judgment."  *Ciralsky*, 355 F.3d at 673 (quoting *Firestone*, 76 F.3d at 1208).  Therefore, if a motion to amend a complaint is not filed until after a final judgment, that motion becomes moot if the Court denies the accompanying Rule 59(e) motion.  *See id.*; *accord Firestone*, 76 F.3d at 1208 (observing that amendment of complaint may only occur after final judgment "once the court has vacated the judgment," and "to vacate the judgment, Appellants must first satisfy Rule 59(e)'s more stringent standard").

## III.   DISCUSSION

Here, the plaintiffs present six grounds for the Court to alter or amend its prior judgment dismissing this action: (1) the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1605(a)(5)—a jurisdictional basis that the plaintiffs claim was "inadvertently omitted from their Third Amended Complaint;" (2) "[t]his Court erred in determining that constructive custody cannot satisfy the 'custody or physical control' requirement" contained in the statutory definition of torture; (3) "[t]his Court erred in determining that Plaintiffs were not 'nationals' of the U.S." at the time the acts of torture and extrajudicial killing were carried out against the plaintiffs; (4) "[t]he Court improperly determined that the only acts listed under 28 U.S.C. § 1605A that could plausibly apply to the facts of this case were 'torture' and 'extrajudicial killing;'" (5) "[t]his Court erred in finding that it lacked subject matter jurisdiction under the [ATS];" and (6) "[b]oth the Court and the Defendants conceded subject matter jurisdiction as the law of the case when this Court entered a default against Defendants."   *See* Pls.' Recons. Mem. at 3, 28.  Each of these arguments is addressed below.

### A.        The Plaintiffs Have Forfeited Certain Arguments.

At the outset, arguments (4) and (6) above have never been raised by the plaintiffs until now,[2] and argument (1) above was never raised in the Third Amended Complaint, at the

---

[2] Even if these arguments had not been waived, they would be unpersuasive.  In argument (4) above, the plaintiffs contend that the Court should have considered "hostage taking" and "provision of material support and resources" as bases for subject-matter jurisdiction under the state-sponsored terrorism exception of the FSIA, 28 U.S.C. § 1605A. See Pls.' Recons. Mem. at 28–31.  "Hostage taking," as defined by the FSIA, occurs when a person "seizes or detains and threatens to kill, to injure or to continue to detain another person in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002).  The plaintiffs argue that "[d]efendants have essentially taken Plaintiffs' parents hostage" because "the Iranian regime has seized and detained [them] by barring them from leaving Iran and coming to the United State to visit their children." Pls.' Recons. Mem. at 29.  Like the plaintiffs' other expansive interpretations of statutory language, *see infra* Part III.B, the plaintiffs' conception of "hostage taking" is far too broad.  Although the plaintiffs' parents may be unable to leave the territory of Iran, that does not make them hostages within the meaning of the FSIA.  Equating travel restrictions with "hostage taking" would, for example, render the United States liable as a hostage taker for revoking a citizen's

evidentiary hearing, or in the plaintiffs' briefing regarding subject-matter jurisdiction.   As a result, the plaintiffs have waived these arguments.   *See, e.g.*, *GSS Group*, 680 F.3d at 812.   With respect to argument (1) above, the plaintiffs pleaded 28 U.S.C. § 1605(a)(5)—also known as the FSIA's "non commercial tort exception" to foreign sovereign immunity—as a basis for subject-matter jurisdiction in previous iterations of their complaint.   *See* Second Am. Compl. ¶ 13, ECF No. 11; Am. Compl. ¶ 9, ECF No. 5; Compl. ¶ 9, ECF No. 1.   The plaintiffs, however, amended their complaint following the evidentiary hearing "to conform with the supplemental evidence obtained during the [evidentiary hearing]" and to "focus[] on the material facts and legal vehicles that are now part of this cause."   *See* Pls.' Mot. to File Third Am. Compl. at 2, ECF No. 39.   In the Third Amended Complaint, the plaintiffs removed their class-action allegations, and also removed 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7) as bases for subject-matter jurisdiction.   In the Third Amended Complaint, the only provision of the FSIA cited is 28 U.S.C. § 1605A–the so-called state-sponsored terrorism exception.   *See* Third Am. Compl. ¶¶ 10, 55, 57.   Likewise, when the Court permitted the plaintiffs to submit briefing on the basis for the Court's subject-

---

passport or placing an individual on a "no fly" list.   The plaintiffs cite no legal authority for the broad interpretation they propose, and this Court will not be the first to adopt it.

The plaintiffs likewise misperceive the meaning of "provision of material support and resources" in § 1605A.   The plaintiffs contend that the defendants have provided material support and resources "in order to perpetrate terrorist threats on Plaintiffs."   Pls.' Recons. Mem. at 30.   The FSIA's state-sponsored terrorism exception, however, only waives sovereign immunity when a foreign state causes injuries resulting from "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources *for such an act*."   28 U.S.C. § 1605A(a)(1) (emphasis added).   "[T]errorist threats" are not acts enumerated in the statute, and thus the provision of material support or resources for "terrorist threats" is not a basis for subject-matter jurisdiction under the FSIA.

Finally, In argument (6), the plaintiffs contend that, "by ordering the entry of default against Defendants, this Court has recognized its jurisdictional powers over Defendants and, thus, had essentially conceded that subject matter jurisdiction exists and this became law of the case."   *See* Pls.' Recons Mem. at 35. Subject-matter jurisdiction, however, is not something that can be "conceded"—either by the parties or by the actions of the Court.   The Federal Rules of Civil Procedure are clear on this point:   " If the court determines *at any time* that it lacks subject-matter jurisdiction, the court *must* dismiss the action."   FED. R. CIV. P. 12(h)(3) (emphasis added).   Thus, there is no such thing as law of the case when it comes to subject-matter jurisdiction, and a clerk's ministerial entry of default does not confer jurisdiction.   In fact, the clerk's entry of default in this case was void from its inception as a result of the lack of subject-matter jurisdiction.   *See Swarna v. Al-Awadi*, 622 F.3d 123, 141 (2d Cir. 2010).

matter jurisdiction, the only provision of the FSIA cited or discussed in that briefing was 28 U.S.C. § 1605A.  *See* Pls.' Jurisdiction Mem. at 17–21.

The plaintiffs now assert, for the first time, that "28 U.S.C. § 1605(a)(5) was inadvertently omitted from the Third Amended Complaint."  *See* Pls.' Recons. Mem. at 12. They thus contend, "given the honest mistake on the part of Plaintiffs . . . consideration of the [sic] 28 U.S.C. § 1605(a)(5) as [a] jurisdictional basis should not be precluded."  *Id.* at 13.  The Court disagrees.  As is apparent from the filing of four complaints in this case, the facts and legal theories underlying the plaintiffs' claims have shifted and transformed as the litigation has progressed.  When the plaintiffs sought leave to file their Third Amended Complaint, they represented to the Court that the Third Amended Complaint was filed "to conform with the supplemental evidence obtained during the [evidentiary hearing]" and to "focus[] on the material facts and legal vehicles that are now part of this cause."  *See* Pls.' Mot. to File Third Am. Compl. at 2.

The Court took the plaintiffs at their word, and thus did not consider any legal theories omitted from the Third Amended Complaint—including the plaintiffs' class-action allegations and the FSIA's non-commercial tort exception.  The abandonment of the non-commercial tort exception was highlighted further by the plaintiffs' failure even to mention 28 U.S.C. § 1605(a)(5) at oral argument regarding subject-matter jurisdiction or in their subsequent, extensive briefing on subject-matter jurisdiction.  *See generally* Pls.' Jurisdiction Mem.; Tr. of Evidentiary Hr'g at 4:5–26:13.[3]  In light of these developments, the Court properly looked to the Third Amended Complaint to determine its jurisdiction, *see Rockwell Int'l Corp. v. United*

---

[3] Although the plaintiffs characterize their abandonment of the FSIA's non-commercial tort exception as an "inadvertent[] omi[ssion]," *see* Pls.' Recons. Mem. at 12, the persistent absence of that provision from the plaintiffs' pleadings, arguments, and briefing regarding subject-matter jurisdiction strongly suggests to the Court that the plaintiffs' abandonment of the non-commercial tort exception was an intentional strategic choice.

*States*, 549 U.S. 457, 473–74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."), and thus did not consider 28 U.S.C. § 1605(a)(5).

It was the plaintiffs' burden to establish that subject-matter jurisdiction exists, *see, e.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008), not the Court's. The plaintiffs were afforded multiple chances to satisfy that burden, and after presenting all of their legal theories, the Court concluded that the plaintiffs came up short. The plaintiffs clearly perceive the Court's non-reliance on the non-commercial tort exception as a "manifest injustice," *see* Pls.' Recons Mem. at 13, but if there is any prejudice to the plaintiffs, that prejudice was self-inflicted, and the D.C. Circuit has made clear that self-inflicted prejudice does not qualify as manifest injustice. *See Ciralsky*, 355 F.3d at 665 ("[M]anifest injustice does not exist where . . . a party could have easily avoided the outcome, but instead elected not to act until after a final order had been entered." (internal quotation marks omitted)). The plaintiffs placed all of their jurisdictional eggs in one basket, despite the Court's multiple invitations to address other jurisdictional bases, and a Rule 59(e) motion is not the vehicle for the plaintiffs to resurrect abandoned legal theories after final judgment.[4] *See, e.g.*, *Bilzerian*, 729 F. Supp. 2d at 15 (observing that Rule 59(e) is not "a chance to correct poor strategic choices").

---

[4] Had the plaintiffs relied on the non-commercial tort exception, it may have been a more viable basis for subject-matter jurisdiction. The non-commercial tort exception does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion is abused." 28 U.S.C. § 1605(a)(5). This is commonly known as the discretionary function exception, which operates to bar suit against a foreign sovereign for certain tortious acts. The plaintiffs do not contend that the defendants' harassing actions were non-discretionary. They contend instead that "illegal acts by foreign sovereigns fall outside the scope of the discretionary function exception." Pls.' Recons. Mem. at 13. Thus, whether or not the provision applies in the instant case would depend upon whether the defendants had exceeded the permissible limits of their sovereign political discretion in harassing the plaintiffs via electronic communications while they were living in the United States. *Compare Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) (recognizing that "a decision calculated to result in injury or death to a particular individual or individuals, made for whatever reason, would be one most assuredly involving policy judgment and decision," but holding that "there is no discretion to commit, or have one's officers or agents commit, an illegal act"), *with Risk v. Halverson*, 936 F.2d 393, 397 (9th Cir. 1991) ("[I]t cannot be said that every conceivably illegal act is outside the scope of the discretionary function

**B.** **The Plaintiffs' Remaining Arguments Do Not Establish Clear Error or Manifest Injustice.**

Since arguments (1), (4), and (6) above were forfeited by the plaintiffs' failure to raise them, the Court must consider whether the plaintiffs' remaining arguments are grounds for altering or amending the final judgment in this case.  As discussed above, there are only three narrow circumstances in which alteration or amendment to a final judgment is appropriate: (1) "an intervening change of controlling law," (2) "the availability of new evidence," or (3) "the need to correct a clear error or prevent manifest injustice."  *Ciralsky*, 355 F.3d 671 (internal quotation mark omitted).  The plaintiffs do not assert any intervening change in controlling law, and they also do not present any new evidence.  Therefore, the Court must decide whether the plaintiffs have established any "need to correct a clear error or prevent manifest injustice."  *Id.*

First, in argument (2) above, the plaintiffs contend that "[t]his Court erred in determining that constructive custody cannot satisfy the 'custody or physical control' requirement" contained in the statutory definition of torture.  *See* Pls.' Recons Mem. at 3.  As discussed in the Court's previous opinion, the definition of "torture" incorporated in the FSIA requires that the relevant act be "directed against an individual in the offender's custody or physical control."  *See Mohammadi*, 2013 WL 2370594, at *12 (quoting 28 U.S.C. § 1350 note, sec. 3(b)(1)).  The same creative theory of constructive custody raised by the plaintiffs in their Motion for Reconsideration was previously raised by the plaintiffs at the evidentiary hearing and in the plaintiffs' jurisdictional memorandum, *see* Pls.' Jurisdiction Mem. at 20; Tr. of Evidentiary Hr'g at 20:14–21:14, and the theory was also flatly rejected by the Court, *see Mohammadi*, 2013 WL 2370594, at *11–13.  In their motion for reconsideration, the plaintiffs continue to rehash the

exception.").  This would have raised unresolved questions regarding the scope of a sovereign foreign state's ability to engage in discretionary tortious conduct for political purposes in the United States.  The Court need not venture into this legal thicket, however, because, as discussed above, the plaintiffs abandoned the FSIA's non-commercial tort exception and have consequently forfeited the chance to raise it as a basis for subject-matter jurisdiction.

same arguments that were previously rejected, including that "in light of modern technological advancements," a "defendant does not need to be physically present to have 'custody' or 'control' over an individual." *See* Pls.' Recons Mem. at 25.

The only new legal authority cited by the plaintiff to establish clear error with respect to the "custody" issue is a district court case from the District of Massachusetts, which applied the Torture Victim Protection Act's ("TVPA") definition of torture[5] to find the former Guatemalan Minister of Defense liable for torture. *See Xuncax v. Gramajo*, 886 F. Supp. 162, 178 (D. Mass. 1995). In that case, an Ursuline nun, who was a U.S. citizen, "was kidnapped, tortured and subjected to sexual abuse in Guatemala by personnel under [the Guatemalan Defense Minister's] command." *See id.* at 173. Specifically, the plaintiff in that case was abducted at gunpoint and taken captive in a warehouse, wherein she "was subjected to horrific treatment," which included burning her with cigarettes, beating her, and repeatedly raping her. *See id.* at 173–74. The issue of "custody" arose because, as the court noted, "it may be argued that [the plaintiff] was never in [the Defense Minister's] personal custody." *See id.* at 178 n.15. The court concluded that the plaintiff was "in the defendant's 'custody' for purposes of TVPA liability, given that the defendant had authority and discretion to order that [the plaintiff] be released." *Id.* *Xunxax* clearly involved a situation where the victim of torture was within *someone's* physical custody, and thus it does not stand for the proposition that mere constructive custody is sufficient to establish "torture." *Xunxax* more accurately stands for the proposition that higher-level officials can be found liable for torture under the TVPA (and thus the FSIA) if they send their agents to torture an individual, rather than personally carrying out the torture. As a result, *Xunxax* is of no help to the plaintiffs in establishing clear error in this case.

---

[5] The FSIA incorporates the TVPA's definition of "torture," and thus it is the operative definition here. *See* 28 U.S.C. § 1605A(h)(7).

In argument (3) above, the plaintiffs argue that "[t]his Court erred in determining that Plaintiffs were not 'nationals' of the U.S." at the time the acts of torture and extrajudicial killing were carried out against the plaintiffs.  *See* Pls.' Recons Mem. at 3.  This argument has also already been raised by the plaintiffs and rejected by the Court.  *See Mohammadi*, 2013 WL 2370594, at *9–11.  In their motion for reconsideration, the plaintiffs grasp at every last straw in an attempt to demonstrate clear error on this issue, but their arguments are all unpersuasive.  The plaintiffs rely on a historical notion of the term "national" from the nineteenth century, they cite and discuss several cases that the Court specifically rejected, and they assert that the Immigration and Nationality Act's ("INA's") definition of "national" "should be read in accordance with general international law principles regarding nationality."  *See* Pls.' Recons. Mem. at 16–20.

The historical notion of the term "national" relied upon by the plaintiffs, which they contend permits them to establish nationality through "acts of allegiance" is anachronistic and no longer has any force, particularly when that historical conception of nationality preceded the INA, which is the operative statutory provision defining nationality in the instant case.  The Court need not even discuss the plaintiffs' reliance on case law that the Court specifically discussed and rejected,[6] other than to point out that the only case cited by the plaintiffs that the Court has not previously addressed, *Lee v. Ashcroft*, 216 F. Supp. 2d 51 (E.D.N.Y. 2002), was reversed by the Second Circuit on the very point for which it is cited by the plaintiffs.  *See Lee v. Ashcroft*, 142 F. App'x 503, 504 (2d Cir. 2005) ("[W]e reject the argument . . . relied on by the district court in granting [the plaintiff's] petition, that an individual can become a noncitizen

---

[6] These two cases include *Asemani v. Islamic Republic of Iran*, 266 F. Supp. 2d 24 (D.D.C. 2003) and *United States v. Morin*, 80 F.3d 124 (4th Cir. 1996).  *See* Pls.' Recons Mem. at 17–19; *see also Mohammadi*, 2013 WL 2370594, at *9–10 (refusing to follow *Asemani* and *Morin*).

national . . . by demonstrating permanent allegiance to the United States.").[7]  Finally, although the plaintiffs invite the Court to interpret the INA "in accordance with general international law principles regarding nationality," *see* Pls.' Recons. Mem. at 19, the Court rejects that invitation. The Court has an obligation to interpret *federal* law in accordance with the decisions of *federal* courts.  As the Court previously observed, "[t]he federal courts of appeals, including the D.C. Circuit, have unanimously endorsed the proposition that a person may only qualify as a 'national of the United States' through birth or completion of the naturalization process." *Mohammadi*, 2013 WL 2370594, at *10 (collecting cases).

Finally, in argument (5), the plaintiffs contend that "[t]his Court erred in finding that it lacked subject matter jurisdiction under the [Alien Tort Statute]." Pls.' Recons. Mem. at 3.  This argument stems from the plaintiffs' disagreement with the Court's interpretation of the Supreme Court's recent decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).  *See* Pls.' Recons. Mem. at 31–34.  In this regard, the plaintiffs argue that "the factual circumstances behind the torts claimed in this case are easily distinguishable from the circumstances at issue in *Kiobel*." *Id.* at 33.  The plaintiffs' disagreement with the Court's application of *Kiobel*, however, does not constitute clear error.  *See, e.g.*, *Becker*, 305 F.3d at 290 ("'Mere disagreement does not support a Rule 59(e) motion.'").  The plaintiffs are free to pursue that disagreement on appeal. Moreover, even had the Court erred in applying *Kiobel*, it would be harmless error.  Jurisdiction under the ATS would not cure the fact that the defendants are shielded from suit by sovereign immunity because the ATS is not an exception to foreign sovereign immunity.  Thus, even if the ATS were a colorable basis to bring suit, it would not confer subject-matter jurisdiction in this case.

---

[7] In fact, in reversing the district court in *Lee*, the Second Circuit relied on a case cited by this Court in rejecting the plaintiffs' similar theory in the instant action.  *See Lee*, 142 F. App'x at 504 (citing *Marquez-Almanzar v. INS*, 418 F.3d 210 (2d Cir. 2005)); *see also Mohammadi*, 2013 WL 2370594, at *10 (citing *Marquez-Almanzar*).

**IV.      CONCLUSION**

The Supreme Court has long recognized that "[t]here must be an end to litigation someday." *Ackermann v. United States*, 340 U.S. 193, 198 (1950).  The instant case is no exception.  The Court acknowledges the persistence and creativity of plaintiffs' counsel in attempting to save this case from dismissal—even after final judgment—but the Court finds those efforts unpersuasive.  The extraordinary remedy of altering or amending a final judgment is reserved for a narrow set of circumstances, none of which is presented here.  The Court denies the plaintiffs' motion for reconsideration and also denies the plaintiffs' motion to amend as moot.  *See Ciralsky*, 355 F.3d at 673.

An appropriate Order accompanies this Memorandum Opinion.

Date: July 12, 2013

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge